## Krepps et al. v. Carlisle et al., Appellants.

*Charge of court—Practice, C. P.*

In charging the jury the trial judge should give correctly the substance of the testimony, and caution the jury who have heard it, as to their right to determine exactly what fell from the lips of the witnesses; but the court is not bound to repeat the testimony verbatim. If the judge makes a serious mistake in narrating the facts, counsel should call his attention to it immediately after the charge.

*Ejectment—Evidence—Deed—Description.*

In an action of ejectment where a deed sixty years old calls for a corner at the end of a bridge, and the exact position of the end of the bridge at the time of the execution of the deed is disputed, the question of the location of the bridge should be submitted to the jury.

*Evidence—Competency of witness—Party dead—Act of 1887.*

In an action of ejectment, where the location of the end of an ancient bridge is in dispute, defendant may be permitted, under the act of May 23, 1887, P. L. 168, to testify that since the death of one of the plaintiffs in the suit and after the suit was brought, an old abutment of the bridge had been uncovered by a flood, although it tended to prove a fact in the lifetime of the deceased party.

Argued May 8, 1893. Appeals, Nos. 146 and 261, Jan. T., 1892, by defendants, Wilson Carlisle and Robert Bolen, from

judgment of C. P. Fayette Co., June T., 1883, No. 100, on verdict for plaintiffs, Ada. D. Krepps, widow, and Anna V. Krepps, John B. Krepps, Jr., and Lizzie B. Krepps, children and heirs at law of John B. Krepps, deceased. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and THOMPSON, JJ.

Ejectment.   Before EWING, J.

Before the case was called for trial, the death of Lizzie B. Krepps, one of the plaintiffs, was suggested of record.

At the trial, the only question in dispute was as to where upon the ground was the eastern end of the bridge over Dunlap's creek. Plaintiffs did not deny that if that point was the end of the span over the creek, or the abutment or pier on the east bank of the creek, the lot in dispute would not be covered by their title papers, nor did defendants allege that they had any title if the eastern end of the bridge was the beginning of the structure which led up to the creek span. When one of the defendants was on the stand the following offer was made:

Mr. Campbell: I propose to prove by this witness, that since the death of the plaintiffs' intestate, the location of the old abutment of the bridge (that it) has been uncovered by a flood, and to prove the location of it as this witness saw it since the death of John B. Krepps. Objected to as incompetent, because the effect of it is to prove the existence of a fact during the lifetime of John B. Krepps, or his predecessors in the title. Objection sustained and exception. [2]

Plaintiff offered as a witness Solomon G. Krepps as to matters occurring prior to the death of his father, Samuel J. Krepps. Mr. Campbell: I object to this witness answering any questions about matters occurring prior to the death of his father. By the Court: He has no interest in it, has he? Mr. Campbell: Well, he might have, we don't know about that,—he is one of the heirs of Samuel J. Krepps, they might have a part of the Carlisle land in that partition. By the Court: That wouldn't make any difference, he must claim under Samuel J. Krepps. Mr. Campbell: Well, the best understanding I can get of the act of 1887 is, whenever there is a controversy including the whole of any property that has passed by devolution, the parties interested in that stand as they did before the act was passed. By the Court: But he has no interest; that is what

I am trying to get at.   Mr. Campbell: Yes, he would be a competent witness between his brothers and sisters, but here is a case where the whole estate of Samuel J. Krepps is against an outsider.   By the Court: Any interest he may have had he has parted with long ago.   Mr. Lindsey: And neither is he a party to the record.   Mr. Campbell: I don't know whether he has parted with his interest.   By the Court: I thought he had by the partition proceedings introduced here.   Objection overruled and bill sealed. ·[8]

The court charged in part as follows:

" The jury will remember what the contention between the parties here is.   [It is practically an inquiry for you to determine where was the eastern end of the bridge over Dunlap's creek, which was the point upon the ground called for in the reservation made in the agreement between Gillespie and Krepps,] [2] and subsequently the point called for as descriptive of the land conveyed by Gillespie to Eli Abrams, and from him to Lucas, and through him to Samuel Thompson, one of the present defendants.   If the eastern end of the bridge over Dunlap's creek means the end of the span going over the creek as contended for by the defendants, then the Krepps deeds do not cover the land in dispute, but it was expressly reserved by Gillespie and is embraced in the papers showing title here in the defendant Samuel Thompson and the other defendants in this case who hold under him.

" Now as bearing on that point you will have to determine just exactly what the nature and character of the structure was at that time, so as to find out where the end of the bridge was.   A bridge, as you all know, is a structure made for the purpose of obtaining a passageway over something; ordinarily, it is over streams, but it may be over other roadways.   Here, the object of the structure was to get a passageway over Dunlap's creek.   But by reason of the conformation of the ground on the eastern side of the creek in the borough of Brownsville, it seems to have been necessary to make some way of getting to an elevation which would plant you upon the other side properly in the borough of Bridgeport, the bank there being much higher than in the borough of Brownsville; and some of the witnesses have said, and detailed to you here in your hearing, that the bridge structure began within three or four feet of the

Abrams house and was continuous from there until resting up-
on the abutment on the other side. Others have said, and it
is argued by counsel for the defendants here as their case, that
the erection, structure, whatever it was, extending from near
Abrams's house to where that pier on the eastern side of the
creek rested, was but an approach to the bridge proper—not a
portion of the bridge, but simply an approach to it; that the
bridge began at that pier, and that the other was but the ap-
proach, and that since this present bridge had been erected
that it has all been filled in and made of solid earth and is no
part of the bridge at all, although then it was a wooden road-
way resting upon trestles. Now in addition to the character
of the structure there as you have it from the testimony of the
witnesses and from the delineation shown upon the plot given
in evidence here, it is contended, by the one party and the
other, that this point and that, according to their respective
positions in this case, was recognized as the end of the bridge,
by the party who held title to this property at the time and soon
after it was sold by Gillespie to the different subsequent own-
ers. [For instance, the plaintiffs contend here, that Eli Abrams
who was the first vendee of Gillespie said, as Judge Duncan
has told you in his testimony, that the line of his land was
about his porch, or along his porch, taking in, perhaps, a por-
tion or nearly all of his porch, and that was the line, as we
understood, between him and Krepps running along the west-
ern porch of his, Abrams's residence.] [3] [Then Daniel
Campbell, another witness on the part of the plaintiffs, testified
that Lucas, while he was the owner of the property there, told
him that he only claimed the ground his house covered, and his
porch. That is, I believe he said the whole of his porch—the
ground covered by his house and the entire porch, or a portion
of it at least, the porch being on the west side of his house.] [4]
Those witnesses detail these facts, and the plaintiffs say that
that goes to show that the parties who owned the land at that
time, recognized the end of the approach, as we will say, to dis-
tinguish it from the bridge proper, to be the end of the bridge, and
it was so meant and intended and recognized by the parties in
making these conveyances wherein they spoke of these corners of
the land; and you will remember that that comes within three or
four feet of the Abrams house; and according to this testimony,

if those parties recognized it at the time, it goes to show that they only claimed the land up to that point. On the other hand, instead of that being the case, and in addition to the arguments they use as to the nature and character of the structure there, the defendants claim that it is shown by the testimony of William Chatlandt and other witnesses that Lucas claimed, when he was in possession, that the ground ran clear up to where they claim the line was—up to the end of the bridge—and they say that this is shown by the testimony of William Chatlandt when he testifies that he rented this house from Lucas in 1854, I believe, and resided there from 1854 to 1859, and during that time, in addition to the porch on the west side of the house, he also had a kitchen just outside of the porch—a small structure some $8 \times 10$, and also had a hogpen outside of the porch there somewhere about the same size, and in addition to that a garden plot which he made use of by the consent of Mr. Lucas, his landlord, which garden plot, he says, extended from these buildings about some thirty feet in the direction of the bridge, being some ten or twelve feet wide and inclosed by the parapet wall or wing-wall on the one side and by a stave fence which he made on the other side; that he used that while he was there, and that, after he left, Lucas continued to use it; and that it is also shown, they say, by the testimony of Harvey Leonard, who says that there was a fence upon this ground most of the time, or at least a portion of it, and that this ground covered by these buildings is a portion of the ground that is now claimed in this suit; and so they say, that having made use of it in that way, goes to show that they claimed title to it, and that the land meant to be embraced between the Abrams house and the eastern end of the bridge was the land between the Abrams house and the eastern end of the bridge proper, or the span going over the creek, and not the approach or trestle way leading to that span.

" [ On the other hand it is not denied that the Kreppses always claimed title to this land, and one of the witnesses—Mr. Chatlandt, I believe—speaks of Mr. Krepps having come along there one day and spoken to him about having inclosed a part of his land, but he would allow him to use it in that way as long as he staid there, they being great friends.] [5]   The land embraced in this action it seems was vacant, unimproved land

lying open there, not improved in any way up until comparatively recent years, and adjoining it, and likewise embraced in the inclosure, so far as the evidence discloses, and not separated from it by any lines or division fence, or anything of that kind, from the lot in dispute, was what was known as the Krepps bottom; and they say that the Kreppses always claimed that it was embraced within their title papers and that it was a portion of their claim along with the bottom lands, and was so used.  [ But there doesn't seem to have been a continuous inclosure, occupation or cultivation of this particular lot of ground for any time, so as to give title by hostile, adverse, continuous possession, so that it refers to the construction of the title papers in this case as to what was meant by the eastern end of the bridge over Dunlap's creek.] [6]  [If it was the eastern end of the span over the creek, why then, according to the papers, you may find that the land is embraced within the Thompson deed and not the Krepps conveyance, and your verdict should then be for the defendants.  If it was the beginning of the structure by which passage was made from the eastern side of Dunlap's creek to the western side, and which came within three or four feet of the Abrams house, then it is contended by counsel that you may find from the papers that the land in dispute is embraced in the title papers of the plaintiffs, and was not embraced in the reservation made by Gillespie, and your verdict should be for the plaintiffs.  This is the question you will have to determine from the testimony you have heard from the witnesses here and the facts and circumstances surrounding the case, as you may determine from the plot and other matters of record which have been given in evidence before you.] " [7]

Verdict and judgment for plaintiffs.  Defendants appealed.

*Errors assigned* were, (1, 8) rulings on evidence; (2–7) instructions, quoting bills of exceptions and instructions as above.

*Edward Campbell*, for appellant, cited : Stephens v. Cotterell, 99 Pa. 188 ; Rothrock v. Gallaher, 91 Pa. 108 ; Porter v. Nelson, 121 Pa. 628 ; Patterson v. Dushane, 137 Pa. 23 ; Feig v. Meyers, 102 Pa. 10 ; Miller v. Eshleman, 43 Leg. Int. 499 ; Sandford v. Decamp, 8 Watts, 542 ; McLaughlin v. McLaugh-

lin, 91 Pa. 462; Potts v. Wright, 82 Pa. 498; Hart v. Girard, 56 Pa. 23; Connelly v. Walker, 45 Pa. 449; Palmer v. Farrell, 129 Pa. 162; Jones v. Janney, 8 W. & S. 436; Webster v. Laudenslager, 84 Pa. 446.

*G. W. K. Minor*, *R. H. Lindsey* and *R. P. Kennedy* with him, for appellee.

OPINION BY MR. JUSTICE DEAN, October 2, 1893:

By articles of agreement dated the 19th of March, 1829, Neal Gillespie sold to Samuel J. Krepps, for the consideration of $1,400, a piece of land in the borough of Brownsville, Fayette county. The land was described as "situate on the southeast side of Water street in the borough of Brownsville, adjoining lots of Jonathan Binns, George Shuman and others, and now in the tenure of John Snowdon, together with all the bottom land on Dunlap's creek attached to and adjoining the same, with the exception and reservation of a lot of ground running from the corner of Eli Abram's lot, or the lot now in said Abram's occupancy, to the east end of Dunlap's creek bridge, and extending back from the front on Water street 60 feet."

The land described in this agreement, it is not disputed, passed to these plaintiffs. Afterwards, on 13th of June, 1832, the same Neal Gillespie, by deed conveyed to Eli Abrams the part reserved, describing it as, "All that piece of ground situate in the borough of Brownsville, on the south east side of Water street, extending from the lot now owned by Eli Abrams, to the east end of Dunlap's creek bridge and running back 60 feet from the front of Water street."

The title to the land described in this deed, it is not disputed, passed to Samuel Thompson, one of defendants. Running the line of defendant's lot from the Abrams lot owned by Abrams before the sale by Gillespie to Krepps, the ancestor of these plaintiffs, and before the conveyance to Abrams by Gillespie, to the east end of Dunlap's creek bridge, where the end of the bridge is now, would give the land in dispute to defendants; it would be excluded by the reservation in the articles of agreement, and plaintiffs would have no right to the possession. But plaintiffs alleged, and adduced evidence at the trial tending to show, that 60 years ago, when the articles of agreement were

made with Krepps, and the deed made to Abrams, the east end of the bridge was not where it is now; that it was within three or four feet of Abrams's house, and that in the years following, 1829 and 1830, it was so recognized by both the grantees of the Gillespie title.  This evidence was met by contradictory evidence on part of defendants, and it was wholly a question of fact for the determination of the jury.  Plaintiffs' location of the eastern end of the bridge over Dunlap's creek, if the jury found that was the true location when the grants were made, gave the lands in dispute to them.  On the other hand, if the weight of the evidence failed to convince the jury that this was the true location, plaintiffs had no right to the possession.  The court below, assuming, as the parties themselves assumed, that this was the turning point in the case, in a very clear charge submitted the evidence to the jury, who found for plaintiffs. Judgment having been entered on the verdict, defendants took this appeal, assigning seven errors to the charge.

They relate for the most part to alleged verbal inaccuracies of the court in repeating the testimony of witnesses.  Of course, in referring to testimony, the court should give correctly the substance of it, and caution the jury who have heard it, as to their right in determining exactly what fell from the lips of the witness; but the court is not bound to repeat it verbatim, nor is the charge, in the hurry of a common pleas trial, necessarily to be a polished essay on the law and the facts bearing on the issue.  If this were so, the delay incident to jury trials would be a practical denial of justice to suitors.  If the alleged mistakes in narrating the facts were of the gravity now alleged by appellant, the counsel ought to have called the attention of the court to them immediately after the charge.  As he did not do so, it is fair to presume they appeared to him as of as little consequence then as they seem to us now.

As to the statement that plaintiffs' alleged location is absurd and highly improbable, it is sufficient to say it was possible, even in view of the present surroundings; how it may have appeared under wholly different ones, sixty years ago, to the parties dealing concerning it, is not clear; it is enough to say, the court was entirely right in leaving the fact to the jury; it could not have done otherwise without error.  The charge is a fair, unexceptionable submission of the contradictory testi-

mony on the disputed location of the eastern end of the bridge over Dunlap's creek.    Therefore the assignments of error, from second to eighth inclusive, are overruled.

But defendant's first assignment of error, complaining of the rejection of Samuel Thompson's testimony, is more serious.    It was admitted that John B. Krepps and all his predecessors in title were dead; the witness was a party of record.    Defendants' counsel proposed to prove by him that, since the death of plaintiffs' ancestor, the location of the old abutment of the bridge had been uncovered by a flood, and to prove the location of it as witness saw it at that time.    To this plaintiffs objected, on the ground that the witness was incompetent to prove the existence of a fact in the lifetime of John B. Krepps or his predecessors in title.    The court sustained the objection.

This was error, and we cannot agree with the learned court below, in its opinion on the motion for a new trial, that, even if error, it could have done defendants no harm.    True, the question of the location of the old abutment, of itself, is not material; but its situation with reference to the stream might have afforded an inference as to the point where, with an abutment so located, the old bridge ended.    Neither we, nor the court below, can certainly say what inference, favorable to defendants, the jury might reasonably have drawn from the fact sought to be proven; it is sufficient to say it was evidence bearing on the issue of fact in dispute.    That the old abutment, uncovered by the flood after the death of John B. Krepps, had been built in the same place in his lifetime, was an inference which, however obvious, from the fact sought to be proven, would not warrant the exclusion of evidence by the witness of the existing fact.    The offer was to prove a fact after his death, just as if the offer had been to prove that a man sixty years of age was living at time of trial; the fact admissible is the life, the inference of birth sixty years before, in the lifetime of the deceased grantor, necessarily follows, but the fact from which the inference is drawn is one of which the deceased grantor, in his lifetime, had no knowledge, and which is the subject of contradiction by any living witness: Rothrock v. Gallaher, 91 Pa. 108; Stevens' Adm's v. Cotterell, 99 Pa. 188; Porter v. Nelson, 121 Pa. 628; Patterson v. Dushane, 137 Pa. 23.

Therefore appellants' first assignment of error is sustained; the judgment is reversed, and a new trial awarded.